******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MARC ABRAMS *v.* PH ARCHITECTS, LLC, ET AL.
## (AC 40164)

Prescott, Elgo and Blawie, Js.

*Syllabus*

The plaintiff homeowner sought to recover damages from the defendants, P Co., an architectural firm, and V Co., a general contractor, which he had hired to design and perform substantial renovations to his home and surrounding property. The plaintiff's complaint alleged, as to P Co., breach of the architectural contract, breach of warranty, and professional negligence, and, as to V Co., breach of the home construction contract and breach of a separate contract to construct a stone wall. The defendants each filed counterclaims alleging that the plaintiff breached the contracts by failing to pay invoices for services rendered and sought, inter alia, the sums that the plaintiff had withheld in retainage. Following a trial, the court rendered judgment permitting the plaintiff to keep a small portion of the retainage for certain work by V Co. that was defective or incomplete, but otherwise rendered judgment in favor of the defendants on the complaint and on their counterclaims and awarded them damages. On the plaintiff's appeal to this court, *held*:

1. The plaintiff could not prevail on his claim that the trial court improperly failed to enforce provisions of his contracts with V Co. and P Co. pertaining to how change orders and payment requisitions were to be initiated and processed:

    a. The plaintiff's claim that V Co. breached the construction contract by failing to follow change order procedures was unavailing; the plaintiff failed to allege that ground in his complaint as a basis for V Co.'s breach of contract, the trial court did not address the claim in rejecting that count of the complaint, as the court was limited to the allegations in the complaint and had no duty to scrutinize the parties' agreement looking for potential additional breaches, and, therefore, the issue could not form the basis of a claim on appeal that the trial court improperly rejected the plaintiff's claim that V Co. breached the construction contract.

    b. The trial court properly rejected the plaintiff's claim that P Co.'s actions in handling change orders and billing procedures amounted to a material breach of its contract with the plaintiff; that court found no material breach of contract with respect to P Co. while it was still on the project and that any failure of V Co. to follow strict contract procedures after P Co. was terminated from the project could not be attributed to P Co., and the plaintiff did not demonstrate that the court's factual findings were unsupported by the record or that the court failed to give due consideration to the terms of the contract in determining that P Co. had not breached its contract with the plaintiff regarding its handling of change orders.

2. The plaintiff's claim that V Co. failed to construct the wall and fence in a particular location and with certain specifications required by the wall contract was unavailing, the trial court having found that the specifications and location of the wall were modified by subsequent agreement of the parties; that court found that the repositioning of the wall was done at the plaintiff's request when he was confronted with the potential extra cost of building the wall at a location involving significant ledge rock and tree removal, that any deviation from the terms of the contract was authorized and approved by the plaintiff, and that the parties had agreed to modify the terms of the contract by moving the location of the wall to avoid increasing the contract price, which was an expressed concern of the plaintiff, who failed to demonstrate that the court's finding regarding the modification of the contract was clearly erroneous.

3. The plaintiff could not prevail on his claim that the trial court failed to enforce provisions of his architectural contract with P Co. that required P Co. to provide contract administration services and to represent his best interests with respect to the project; although the architectural contract required P Co. to monitor the construction process and review the final work, it also stated that the scope of P Co.'s services during

the actual construction would be finalized at a future meeting once the scope of the project was better understood, which the court determined left some uncertainty, no evidence was presented that a meeting to determine the final scope of the work ever occurred, and there was no evidentiary foundation for the plaintiff's claim that P Co. breached its contract prior to P Co. departing the project, as the court found that, prior to the plaintiff terminating P Co. from the project, P Co. effectively had complied with its contract administration duties by monitoring the progress of the project, engaging in discussions on-site regarding the construction of the rock wall, and reviewing and discussing with the plaintiff a proposed change order submitted by V Co.

4. The plaintiff failed to demonstrate his claim that P Co. had breached the professional standard of care applicable to architects: although the plaintiff presented expert testimony from a practicing architect who had prepared a list of purportedly incomplete or defective work, which indicated that P Co. had failed to adequately advise the plaintiff regarding a radiant heat system under the flooring, to design a code-compliant pool enclosure, and to design a code-compliant cover or enclosure for the hot tub, P Co.'s expert contradicted much of that expert's testimony and, as the trier of fact, the trial court had the authority to resolve that conflict as it saw fit and was not required to credit any part of the testimony by the plaintiff's expert; moreover, there was an evidentiary basis for the court's decision to reject the testimony of the plaintiff's expert, as the court found that the plaintiff made a final decision regarding radiant heat after P Co. was no longer involved with the project, that although P Co. had told the plaintiff at their first meeting that the pool would need to have fencing around it in order to comply with the town's pool code, the plaintiff insisted otherwise and that a proper pool enclosure fence was specifically not included in the scope of work that the plaintiff set out for P Co., and that hot tub manufacturers provide code-compliant covers for hot tubs and that such a cover was on the tub when it was installed.

5. The trial court's findings regarding the plaintiff's "punch list" that identified certain items of work that V Co. allegedly had left incomplete or in need of repair were not clearly erroneous; the plaintiff's claim called into doubt the trial court's calculation of the portion of the retainage that the plaintiff was permitted to keep for incomplete or defective work, which the plaintiff maintained exceeded $500,000, the trial court determined that the punch list and its associated pricing were rife with errors and exaggerations and included, for example, the costs associated with removing and reconstructing the stone wall and removing the entire interior hardwood floor, and that court previously had determined there was no credible evidence or economic rationale that supported taking those the corrective actions.

Argued April 9—officially released July 31, 2018

*Procedural History*

Action seeking to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant V.A.S. Construction, Inc., filed a counterclaim; thereafter, the named defendant filed a counterclaim; subsequently, the matter was tried to the court, *Hon. Taggart D. Adams*, judge trial referee; judgment for the defendants on the complaint and counterclaims, from which the plaintiff appealed to this court. *Affirmed.*

*Jane I. Milas*, for the appellant (plaintiff).

*Jared Cohane*, with whom was *Alexa T. Millinger*, for the appellee (named defendant).

*Gregory J. Williams*, for the appellee (defendant V.A.S. Construction, Inc.).

*Opinion*

PRESCOTT, J. This appeal arises out of a dispute between a homeowner and the architectural firm and general contractor that he hired to design and perform substantial renovations to his home and surrounding property in Greenwich. The plaintiff, Marc Abrams, appeals, following a trial to the court, from the judgment rendered against him on his complaint and on the counterclaims of the defendants, PH Architects, LLC (PH), and V.A.S. Construction, Inc. (VAS). The plaintiff claims on appeal that the court improperly (1) failed to enforce provisions in his contracts with VAS and PH related to the processing of change orders and invoices; (2) failed to find that VAS had breached a separate contract governing the construction of a stone wall and fence on the property; (3) failed to enforce provisions in his contract with PH pursuant to which PH agreed to provide contract administration services; (4) failed to conclude that PH was liable for professional negligence because it had breached the professional standard of care for architects; and (5) made clearly erroneous factual findings with respect to a "punch list" that was prepared on behalf of the plaintiff by a third party.[1] We are not persuaded by the plaintiff's claims and, accordingly, affirm the judgment of the court.[2]

The following facts, which either were found by the court or are undisputed in the record, and procedural history are relevant to our discussion of the plaintiff's claims on appeal. The plaintiff is a New York attorney employed by a firm that oversees union elections. In 2010, he purchased an existing, single-family home located in Greenwich at 39 Hunting Ridge Road (property). The property consists of an approximately four acre lot that, in addition to a split-level home, features an outdoor swimming pool, a pond, a barn, and a tennis court.

On May 14, 2010, the plaintiff entered into a contract with PH, an architectural firm, for services related to the design of renovations and additions that the plaintiff sought to make to the interior of the home and to the surrounding property (architectural contract). He was introduced to the principals of PH, Peter Paulos and Philip Hubbard, by his realtor, and met with them at the property on May 11, 2010, to discuss the renovation project. At that meeting, the plaintiff conveyed to the architects his desire to contain the overall cost of the project, indicating to them that, in designing and quoting the project, they should contemplate using only the highest quality materials and labor in order to help guard against the possibility of the project later running over budget. He believed that by getting quotes for high end materials and workmanship, any subsequent changes that occurred likely would involve a reduction, rather than an increase, in the overall price of the project.

PH drafted a proposal dated May 12, 2010, that listed all of the proposed work items and set forth the hourly rates that PH would charge for various aspects of its work, including taking detailed measurements of the property and preparing a schematic design of the planned house alterations. The proposal also provided that, after completing the schematic design, PH would prepare outline specifications to use in soliciting preliminary bids from contractors. PH would next make any necessary changes to the schematic design, following which it would establish a lump sum fee for preparing complete drawings and negotiating and administrating construction contracts. The proposal expressly left open the cost for PH's services during the actual construction period. The parties signed the proposal on May 14, 2010, which all parties agree constitutes the entirety of the architectural contract between the plaintiff and PH.

A schematic design limited to the house renovations was completed in June, 2010. The plaintiff approved the design, but wanted additional information regarding potential construction costs. With the consent of the plaintiff, PH also obtained additional landscape architectural plans from a third party. The plaintiff, however, rejected those landscape plans. He also rejected the initial bid that PH had obtained for the housing renovations, believing it was too high. He then authorized PH to complete a more detailed set of structural drawings and specifications for the residence in order to solicit additional construction bids.

After receiving bids, PH prepared a bid comparison sheet for the plaintiff that showed bids ranging from $1.2 million to over $1.5 million. The plaintiff was unhappy and wanted the overall cost of the project reduced significantly, indicating to Hubbard that he wanted the total cost to be closer to $600,000. In October, 2010, PH prepared a list of possible changes that could help to reduce costs, including eliminating a proposed office and a closet addition. The plaintiff approved many of PH's cost saving proposals. He also suggested, however, additional changes not in the original plan, including adding a side deck, an outdoor fireplace, and a larger master bedroom. After incorporating the changes approved by the plaintiff, PH obtained new bids.

VAS, a general contracting business owned by Vincent Sciarretta, consistently was the low bidder throughout the bidding process. VAS constructs new homes and additions to existing homes. It submitted a bid of between $860,000 and $912,000.

On December 6, 2010, the plaintiff entered into a contract with VAS for construction services involving the additions and renovations to the home contained in the architectural plans (construction contract). The

contract was a standard form American Institute of Architects (AIA) agreement that included a total contract price for the renovations and additions of $921,557.34.

The plaintiff later entered into an additional AIA contract with VAS on December 16, 2010, for the construction of a stone wall on the property (wall contract). The stone wall was intended to run along the front of the house, connect with perimeter fencing around the remainder of the property, and include two operating gates. The contract called for a concrete footing to be placed three and one-half feet below grade to secure the fencing. The total additional cost for the wall contract was $229,985.80.

Due to significant conflicts that arose between the plaintiff and PH,[3] PH left the project prior to its completion. The plaintiff never engaged a replacement architect to oversee the project. Serious conflicts also arose between VAS and the plaintiff regarding, inter alia, certain change orders submitted by VAS. Nevertheless, despite the plaintiff failing to make all requested progress payments, VAS continued working on the construction project, substantially completing its work by late November or early December, 2011.

The plaintiff, who was unhappy with the results and overall cost of the project, initiated the present action in September, 2012. The operative amended complaint was filed on September 20, 2013, and contained five counts, the first three directed against PH and the remaining two against VAS.

With respect to PH, count one alleged that PH breached the architectural contract with the plaintiff by "failing to provide complete and accurate plans and specifications for the construction of the project, failing to provide construction administration services, failing to monitor the cost and the quality of construction of the project, failing to correct the errors, omissions, and deficiencies in the services and work product provided by PH, failing to address [the plaintiff's] reasonable questions and concerns, and instead abandoning the project when problems were becoming apparent to [the plaintiff]." Count two alleged that PH had breached an express warranty that guaranteed it was qualified to perform the services undertaken in the architectural contract and that it would do so with the care, diligence, and skill exercised by professional architects. Count three sounded in professional negligence, alleging that PH breached its duty to perform with "that degree of skill, care, and diligence [that] professional architects normally exhibit under like and/or similar circumstances."

With respect to the remaining counts against VAS, count four alleged that VAS breached both the home construction contract and the wall contract in a variety

of ways. More particularly, the plaintiff alleged that VAS breached the contracts by failing to complete the work, using lesser quality materials than specified, and performing defective work that would require repair or replacement. The plaintiff provided the following additional examples of VAS' alleged breach of the home construction contract: "[T]he master bedroom deck is poorly constructed; stairs are not adequately secured and shake significantly when walked on; plumbing fixtures in various locations are loose and not properly centered or installed; the electrical system is incomplete and many switches do nothing; the supply ductwork in the basement has not been insulated; tile in areas such as the laundry room is cracked; interior trim is defective and there are many instances of miters opening up; bilco door is not installed properly or weatherstripped; trim boards at exterior of dining nook are warping and delaminating below and around windows; material for front gates and fence is not what was specified and is of lower quality; cabinets are incorrectly installed; flooring is cupping and will have to be removed; many items of work remain incomplete." Count five sounded in negligence. The plaintiff alleged that VAS, as a general contractor, owed him a duty to perform its work pursuant to the contract and free from defects, and that it breached that duty, citing again the defects set forth in the breach of contract count.

In addition to filing an answer and special defenses denying any liability, the defendants each filed a breach of contract counterclaim against the plaintiff. In its counterclaim, PH alleged that the plaintiff had breached the architectural contract by wrongfully terminating it from the project and by failing to pay PH in full for the engineering and architectural services rendered prior to its termination. VAS alleged in its counterclaim that, with the exception of certain obligations that the plaintiff wrongfully prevented or precluded it from performing, it had performed or substantially performed all of its obligations under its contracts with the plaintiff and, yet, the plaintiff had failed to pay invoices totaling $132,996.18 and to release an additional $85,613.46 being held in retainer.[4] The plaintiff denied the defendants' special defenses and counterclaims.

A trial to the court, *Hon. Taggart D. Adams*, judge trial referee, was conducted between April 26 and May 6, 2016. The parties each submitted a posttrial memorandum on October 12, 2016.

On February 7, 2017, the court issued its memorandum of decision, disposing of all counts of the complaint and the counterclaims. With respect to PH, the court concluded that the plaintiff had failed to prove any of his causes of action, rendering judgment against him on counts one through three of the complaint. The court also rendered judgment against the plaintiff on PH's counterclaim, awarding damages of $3991.56.

With respect to VAS, the court found that the plaintiff had failed to prove that VAS breached either the home construction contract or the wall contract. The court nevertheless found that the plaintiff was entitled to keep $8450 of the retainage as a result of certain incomplete or defective work. The court rendered judgment in favor of VAS on its counterclaim, and awarded it damages of $132,966.18 plus 6 percent prejudgment interest of $24,092.34, as well as $77,162.46, the net balance of the retainage. This appeal followed.

Before turning to our discussion of the plaintiff's claims, we first address the appropriate standard of review, which is disputed by the parties. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . We afford great weight to the trial court's findings because of its function to weigh the evidence and determine credibility. . . . Thus, those findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 431–32, 849 A.2d 382 (2004).

The plaintiff seeks to frame his claims on appeal as implicating our plenary review, arguing that his claims involve questions of contract interpretation or challenge legal conclusions of the court. It is axiomatic that matters of law are entitled to plenary review on appeal. See *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010). It is similarly well settled that, if definitive contract language exists, "the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000); see also 11 S. Williston, Contracts (4th Ed.1999) § 30:6, pp. 77–83 ("[t]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face" [internal quotation marks omitted]). Moreover, whether contractual language is plain and unambiguous is itself a question of law subject to plenary review. See *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 669–70, 791 A.2d 546 (2002).

The defendants, by contrast, maintain that the plain-

tiff's claims on appeal do not truly raise any substantive questions of law or involve construction of relevant contract provisions but, rather, only seek to have this court reassess the credibility of witnesses and retry the court's factual findings underlying its determination that the plaintiff failed to demonstrate that either defendant materially breached its contract with the plaintiff or is otherwise liable for damages. "The determination of whether a contract has been materially breached is a question of fact that is subject to the clearly erroneous standard of review." *Efthimiou* v. *Smith*, 268 Conn. 487, 493, 846 A.2d 216 (2004). We agree with the defendants that the plaintiff's claims on appeal primarily are factual in nature. Accordingly, although we review de novo any questions of law that arise, to the extent that the plaintiff merely challenges the factual underpinnings for the court's legal conclusions, we will not engage in a wholesale reweighing of the evidence, but will review such claims under our clearly erroneous standard of review. With these principles in mind, we turn to a discussion of the specific claims raised by the plaintiff.

I

The plaintiff first claims that the court improperly failed to enforce provisions of his contracts with VAS and PH, specifically, provisions pertaining to how change orders and payment requisitions were to be initiated and processed.[5] According to the plaintiff, VAS failed to follow the procedures set forth in the construction contract, which required it to obtain the plaintiff's approval for any changes prior to performing the associated work. Further, he argues that, pursuant to his contract with PH, PH was required to review and approve payment requisitions and change orders submitted by VAS, but PH failed to insure that VAS followed the procedures in the construction contract.

In response, VAS argues that, to the extent the plaintiff's claim is directed at it, we should reject that claim for three reasons. First, VAS argues that the plaintiff's claim falls outside the scope of the pleadings because the plaintiff never alleged in his complaint that VAS breached the construction contract by failing to adhere to provisions governing change orders and payments, nor was that issue decided by the court. Second, VAS argues that the plaintiff has failed adequately to brief this claim. Third, VAS argues that the claim fails on its merits.

PH argues that the claim also fails with respect to it because the trial court properly rejected the plaintiff's allegation that PH had breached its contract with the plaintiff by failing to adhere precisely to requirements in the change order provisions of the construction contract. PH notes that, prior to leaving the project, it was only involved with the processing of a single change order and that the court found that PH's omission of

that change order on a certified payment requisition was "not of serious moment," or, in other words, not a material breach of contract.[6]

The following additional facts are relevant to this claim. Pursuant to the architectural contract, PH agreed to provide "contract administration" services during the construction phase of the project. Contract administration was defined in the architectural contract as follows: "monitoring the construction process, making periodic site visits, representing [the plaintiff] during the construction process, reviewing and approving applications for payment to the contractor, review of the final work, preparation of a punch list to complete the work and issuing final acceptance of the work." The architectural contract contains no express provision about PH's responsibilities regarding the processing and handling of change orders; such provisions are found in the construction contract. In particular, article 7 of the general conditions of the construction contract contains a number of provisions that governed the process by which the parties were permitted to make changes to the work.

In its memorandum of decision, the court addressed the plaintiff's arguments regarding improper change orders and invoicing procedures in addressing the plaintiff's assertions of breach of contract against PH. In that context, the court stated as follows: "[I]t is true that PH did approve an application for payment to VAS on April 29, 2011 . . . in which VAS had not included the fact that a change order in the amount of $5141.80 had been previously approved by [the plaintiff] in writing on March 31, 2011. . . . This oversight is not of serious moment, because [the plaintiff] had already paid for the change order on April 26, [2011] . . . and subsequent change orders signed by [the plaintiff] clearly showed all the additions to the original contract price that had been approved. . . . More importantly, [the plaintiff's] claim that PH never submitted or reviewed with him any proposed change orders is without evidentiary support. Indeed, it was PH's submission to [the plaintiff] of the VAS proposed change orders, including the addition of radiant heat to the project, that precipitated the previously discussed virulent e-mail by [the plaintiff] to PH on May 24, 2011. . . . In addition, on May 13, 2011, there was a meeting at the construction site during which a number of proposals, changes, new architectural sketches and costs were discussed. . . . After PH left the project there was no architect with whom [the plaintiff] could discuss the proposed changes." (Citations omitted.)

A

We turn first to the plaintiff's claim that VAS breached its construction contracts with the plaintiff by failing to comply with change order procedures. We agree with VAS that the breach of contract claim as set forth in

the operative complaint did not include or rely upon any allegation that VAS had failed to adhere to provisions in the construction contract pertaining to change orders. Accordingly, this aspect of the plaintiff's claim fails.

"The pleadings determine which facts are relevant and frame the issues for summary judgment proceedings or for trial. . . . The principle that a plaintiff may rely only [on] what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations [in] his complaint. . . . A complaint must fairly put the defendant on notice of the claims . . . against him. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . Only those issues raised by the [plaintiff] in the latest complaint can be tried [by the trier of fact]." (Citations omitted; internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 621, 99 A.3d 1079 (2014).

In its breach of contract count against VAS, the plaintiff's allegations specifying the manner in which VAS allegedly breached its contracts with the plaintiff were limited to assertions that VAS had not satisfactorily completed aspects of the construction project, had used inferior and unspecified materials, or had performed defective work that would require repair or replacement. Although there was testimony at trial discussing how change orders were handled, the plaintiff never sought to amend his complaint to include additional specifications of breach of contract to its count against VAS. If the plaintiff had provided notice of this aspect of its claim through proper pleading, VAS may have produced additional evidence or tailored its presentation of evidence differently.

In considering a breach of contract claim, the trial court is limited to the allegations in the complaint and has no duty to scrutinize the parties' agreement looking for potential additional breaches. The court's silence in its memorandum of decision with respect to VAS' alleged noncompliance with the contract's change order procedures is further evidence that this issue was not properly raised to the court.

In sum, we conclude that the failure to follow change order procedures was not raised in the operative complaint as a basis for the plaintiff's count alleging breach of the construction contract by VAS, nor was the issue addressed by the trial court in rejecting that count of the complaint. Accordingly, that issue cannot form the basis of a claim on appeal that the court improperly rejected the plaintiff's allegation that VAS breached the construction contract.

B

We next turn to the plaintiff's claim that PH breached its contract with the plaintiff by failing to ensure that

VAS adhered to change order and billing procedures set forth in the construction contract. According to the plaintiff, the trial court failed to give effect to those contract requirements. We are not persuaded.

As a preliminary matter, we note that the plaintiff has not claimed that the court misconstrued any particular language in the contract that would invoke our plenary review. The plaintiff also has failed to direct our attention to any part of the record that would support his assertion that the trial court committed legal error by failing to consider or give effect to any particular contract provision. To the contrary, in discussing the parties' disputes over the procedures followed with respect to changes to the project and the resulting change in the contract price, the trial court specifically cited to article seven of the contract, which, as we have indicated, contains all the relevant provisions governing change order procedures.

We therefore construe the plaintiff's claim as challenging the court's rejection of his argument that PH's actions in handling change orders and billing procedures amounted to a material breach of its contract with the plaintiff. It is important to reiterate that "[w]hether there was a breach of contract is ordinarily a question of fact. . . . We review the court's findings of fact under the clearly erroneous standard." (Internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC*, 124 Conn. App. 425, 433, 4 A.3d 1273 (2010). The court found no material breach of contract with respect to PH while it was still on the project. Specifically, the court found that the plaintiff had not produced an evidentiary foundation for his claim that PH had not consulted with him or sought his approval on change orders. To the contrary, the court found that the evidence presented showed that such consultation in fact had occurred. The court also determined that the plaintiff had failed to demonstrate that he was harmed by technical problems with paperwork. Further, any failure of VAS to follow strict contract procedures after PH left the project could not be attributed to PH because the court found that the plaintiff "terminated Hubbard's services and constructively terminated Paulos' services by his conduct," a finding that is not challenged on appeal.

The plaintiff has not demonstrated that the court's factual findings are unsupported by the record nor are we left on the basis of our review with a conviction that a mistake has been made. We accordingly reject his claim that the court failed to give due consideration to the terms of the contract in determining that PH had not breached its contract with the plaintiff regarding its handling of change orders.

## II

Next, the plaintiff claims that, in concluding that he

failed to prove that VAS breached the wall contract, the court failed to enforce provisions of that contract requiring VAS to construct the wall and fence combination in a particular location with certain specifications. In response, VAS argues that we should uphold the court's conclusion either because the plaintiff failed to establish proof of damages, which is a required element of a breach of contract cause of action, or because the court determined that the parties had modified the contract provisions relied on by the plaintiff. We agree with VAS that the specifications and location of the wall were modified by subsequent agreement of the parties, as found by the court, and that the court properly ruled in favor of VAS on that aspect of the plaintiff's claim of breach of contract.

The following additional facts are relevant to this claim. VAS began work on the stone wall and fence combination in March, 2011. Issues began to arise regarding the construction and location of the stone wall, which prompted an on-site meeting at the end of March between the plaintiff, VAS, and PH. At that time, Hubbard spray painted along the ground where he believed the center line of the wall should run according to the plans. Sciarretta explained to the plaintiff that if VAS constructed the wall using Hubbard's line, it would involve the cutting of trees and, more importantly, require the removal of ledge rock, each of which would result in extra costs being added to the wall contract. The plaintiff "eventually directed that the wall be placed nearer the house to avoid ledge . . . and tree removal."

In its memorandum of decision, the court rejected the plaintiff's claim that VAS breached the wall contract because the wall was not constructed on or near the perimeter of his property along Hunting Ridge Road as set forth in the contract and accompanying architectural drawings. The court found that VAS had constructed the wall as the plaintiff directed. Specifically, the court found that "the repositioning of the wall was done at [the plaintiff's] request when he was confronted with the potential extra cost of building the wall at a location involving significant ledge rock and tree removal." Accordingly, any deviation from the terms of the contract was authorized and approved by the plaintiff.[7]

If parties have modified the terms of a contract, they are contractually bound by those modified terms and, consequently, cannot be found in breach of the original terms. "Modification of a contract may be inferred from the attendant circumstances and conduct of the parties." *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 762, 674 A.2d 1313 (1996). "Whether the parties to a contract intended to modify the contract is a question of fact. . . . The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial

court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness." (Citations omitted; internal quotation marks omitted.) Id.

Here, rather than failing to enforce provisions of the wall contract requiring VAS to construct the wall and fence in a particular location with certain specifications, the court found that the parties had agreed to modify the terms of the contract by moving the location of the wall to avoid increasing the contract price, which was an expressed concern of the plaintiff. On the basis of our review of the record, the plaintiff has failed to persuade us that the trial court's finding that he agreed to the modification of the contract and directed VAS to build the wall where it currently stands is clearly erroneous. We accordingly reject his claim.

### III

The plaintiff next claims that, with respect to the architectural contract between him and PH, the court failed to enforce provisions that required PH to provide contract administration services and to represent his best interests with respect to the project. We disagree.

Pursuant to the architectural contract, after the design and planning phase of the project was finished and actual construction work had begun, PH agreed to continue to provide services to the plaintiff for the balance of the project. In addition to other services, the contract provided that PH would provide "contract administration," which, as previously indicated, was described in the agreement as "monitoring the construction process, reviewing and approving applications for payment to the contractor, review of the final work, preparation of a punch list to complete the work and issuing final acceptance of the work."

Significantly, the contract also stated that "[t]he scope of [PH's] services during the actual construction can be finalized at a future meeting once the scope is better understood." The court indicated in its decision that this language "left some uncertainty" as to PH's contractual responsibilities during the construction phase, particularly because no evidence was presented that a meeting to determine the final scope of the work ever occurred.

The plaintiff does not dispute the court's finding that there was no evidence of a meeting to finalize the scope of PH's work during construction. Nevertheless, the plaintiff argues that the language regarding contract administration is clear and unambiguous, and that the court failed to give effect to that language in considering whether PH had breached its duties to the plaintiff to provide contract administration services.

As already discussed in part I B of this opinion, how-

ever, the court determined that there was no evidentiary foundation for the plaintiff's breach of contract claim against PH, and that, prior to the plaintiff terminating PH from the project, PH effectively had complied with its contract administration duties by monitoring the progress of the project, engaging in discussions on-site regarding the construction of the rock wall, and by reviewing and discussing with the plaintiff a proposed change order submitted by VAS. Because the plaintiff has not demonstrated that the court rejected his claim on the basis of clearly erroneous factual findings, we reject his claim.

IV

We turn next to the plaintiff's claim that the court improperly concluded that he had failed to demonstrate that PH had breached the professional standard of care applicable to architects. We do not agree.

In order to prevail on a claim of professional negligence or malpractice, a plaintiff has the burden to show the following: "(1) a duty to conform to a professional standard of care for the plaintiff's protection; (2) a deviation from that standard of care; (3) injury; and (4) a causal connection between the deviation and the claimed injury." *Stuart* v. *Freiberg*, 316 Conn. 809, 833, 116 A.3d 1195 (2015). Ordinarily, whether a professional's conduct met the required standard of care or deviated from that standard are questions of fact to be decided by the trier of fact. See *Campbell* v. *Palmer*, 20 Conn. App. 544, 548, 568 A.2d 1064 (1990).

To meet his burden of establishing the standard of care applicable to architects and to show a deviation from that standard, the plaintiff presented expert testimony from Jonathan Hodosh, a practicing architect. His firm, George Hodosh Associates, concentrates on residential additions and alterations. Hodosh visited the property in March and April, 2012, and prepared a "punch list" of purportedly incomplete or defective items. Hodosh's punch list was admitted into evidence at trial. Hodosh testified that, in his opinion, PH breached the standard of care in three ways, by failing (1) to advise the plaintiff adequately about installing a radiant heat system under the flooring, (2) to design a code-compliant pool enclosure, and (3) to design a code-compliant cover or enclosure for the hot tub.

We agree with the court's assessment in its memorandum of decision that the main thrust of Hodosh's expert testimony regarding the radiant heat system was that PH should have brought in a mechanical engineer to design the system and to evaluate the interactions between it and the existing hot air system. He opined that PH should have reconsidered use of the cherry and oak flooring included in the initial architectural plans in light of the decision to introduce a radiant heat system. He also was critical of the fact that PH had made

no provisions in its original plans for a protective enclosure for the hot tub and the swimming pool.

In response, PH presented its own expert, James Lawler, also a licensed architect. Lawler contradicted much of Hodosh's testimony. Lawler testified that PH's construction drawings and specifications were both thorough and well prepared for use by a contractor in executing the design plan. Lawler's professional opinion was that PH had provided the plaintiff with a high level of service. Accordingly, the evidence before the court regarding PH's exercise of its professional responsibilities under the contract was conflicting. As the trier of fact, the court had the authority to resolve this conflict as it saw fit, and was not required to credit any part of Hodosh's testimony. See *Arroyo* v. *University of Connecticut Health Center*, 175 Conn. App. 493, 518, 167 A.3d 1112 ("[if] expert testimony conflicts, it becomes the function of the trier of fact to determine credibility and, in doing so, it could believe all, some or none of the testimony of either expert" [internal quotation marks omitted]), cert. denied, 327 Conn. 973, 174 A.3d 192 (2017).

In fact, the court ultimately rejected Hodosh's testimony, finding it unpersuasive for several reasons. First, the court found that at the time the plaintiff made a final decision to have radiant heat installed in the home, PH was no longer involved with the project. The court found that installing radiant heating was proposed in a "VAS change order in May, 2011, [which] contain[ed] the first cost data related to radiant heat that was forwarded by PH to [the plaintiff] for discussion and precipitated the departure of PH from the project. Prior to that time, PH did not do any design work or coordinate with any mechanical engineer relating to radiant heat because it was entirely uncertain from PH's standpoint whether [the plaintiff] had a real interest in installing such a system since he had shown a strong interest in cutting costs."

The court further found that Hodosh's criticism of PH regarding a code-compliant pool enclosure and hot tub cover were unsupported by the evidence. The court found that, at their very first meeting, PH had told the plaintiff that the pool would need to have fencing around it in order to comply with the pool code in Greenwich. The plaintiff indicated to PH, however, that he believed fencing around the perimeter of the property would enclose both the pool and the pond and that the fencing needed to be in compliance with code. The court credited Hubbard's testimony that PH would never have advised the plaintiff that a perimeter fence would suffice for purposes of a pool enclosure. The court ultimately found on the basis of the evidence presented that "a proper pool enclosure fence was specifically not included in the scope of work [the plaintiff] set out for PH. . . . In fact, at the end of the project,

it was VAS that apparently convinced [the plaintiff] a proper pool enclosure was needed and had it installed." With respect to the hot tub cover, the court credited the testimony of Lawler and Sciarretta that hot tub manufacturers provide code-compliant covers for hot tubs, that such a cover was on the tub when it was installed, and a code-compliant cover was on the tub when Lawler visited the property in April, 2016.

It is clear in the present case that the court rejected the testimony of the plaintiff's expert and credited the testimony of PH's expert in finding that PH had not breached the professional standard of care required of architects. Our review of the record shows that there is an evidentiary basis for the court's decision and we will not engage in a reweighing of the evidence or revisit the court's credibility determinations. Because the plaintiff has failed to demonstrate either a legal or factual basis for disturbing the court's decision rejecting his claim of professional negligence by PH, we reject his claim.

V

Finally, the plaintiff claims that the trial court made erroneous factual findings with respect to a "punch list" that identified certain items of work that VAS allegedly had left incomplete or in need of repair. Principally, the plaintiff takes issue with the court's references to the monetary figures associated with the items on the punch list as "estimates." The plaintiff argues that "the process of estimating the cost of punch list items is well recognized in the case law as a means of putting a dollar value to the items on a punch list" and that the court based its decision "on a belief that 'estimating' is not an accepted methodology for pricing a punch list." We note that the plaintiff's brief lacks clarity in placing this claim into context; however, we construe the claim as intended to call into doubt the court's calculation of damages, in particular the amount of the retainage that the court permitted the plaintiff to keep for incomplete or defective work. Regardless, although the plaintiff is correct that the court rejected the costs associated with the items on the punch list, a review of the relevant portion of the court's decision reveals that it did so, not because it rejected any particular methodology for determining damages or the use of reasonable estimates, but because it concluded that the punch list and the associated pricing were "rife with errors, lack of knowledge and exaggerations." Accordingly, the very premise of the plaintiff's claim on appeal lacks merit.

The following additional facts are relevant to the plaintiff's claim. The plaintiff sought to prove the amount of his alleged damages against VAS through the admission of a punch list that contained various items identified by his architect expert, Hodosh, as either being incomplete or in need of repair. In addition to

the punch list, the plaintiff entered as an exhibit at trial the deposition transcript of an experienced contractor, Todd Lukas. Attached as part of the transcript was Lukas' written report detailing his cost estimates for completing the Hodosh punch list items. The total cost estimated by Lukas was $563,539. Included in his calculations were costs associated with the removal of the existing stone wall and its reconstruction at a different location, and the removal of the entire interior hardwood floor.

The court rejected Lukas' deposition testimony and his estimate of costs associated with the Hodosh punch list as unpersuasive. The court did so not because Lukas' costs were merely estimates and, thus, somehow unreliable, as the plaintiff claims, but because the court determined there was no credible evidence or economic rationale that supported taking the corrective actions upon which those estimates were based. For example, because the court already had determined that the existing wall was built at a location and in a manner approved by the plaintiff, it naturally rejected the estimated cost of completely removing and rebuilding it. Similarly, the court found that the plaintiff had failed to prove that problems with portions of the existing flooring required the complete removal of all flooring in the home, instead crediting the testimony given by a flooring expert that the defects complained of by the plaintiff could be remedied by sanding and refinishing only the affected portions of the floor. The court never stated that estimating the cost of punch list items was an inherently flawed methodology.[8]

As we have already indicated in this opinion, it was well within the authority of the court as the trier of fact to reject as unpersuasive Lukas' opinion and instead to credit the contrary testimony of other expert witnesses. See *Ferri* v. *Pyramid Construction Co.*, 186 Conn. 682, 690, 443 A.2d 478 (1982) (credibility of expert witnesses and weight to accord their testimony within province of trier of fact, "who is privileged to adopt whatever testimony he reasonably believes to be credible" [internal quotation marks omitted]). As previously explained, it is outside the role of this court to second-guess the credibility determinations of the trier of fact. See, e.g., *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, 167 Conn. App. 36, 48, 145 A.3d 266 (2016). Because the plaintiff has failed to demonstrate that the court's decisions were premised upon any clearly erroneous factual findings, we reject his claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] A "punch list" generally refers to a list of items that a contractor must complete or repair before final payment on a project will become due. See *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 783, 17 A.3d 40 (2011).

[2] We note that the statement of issues in the plaintiff's brief differs significantly and substantively from how the issues are briefed. To the extent that the statement of issues raises additional claims that have not been briefed,

those claims are deemed abandoned. See *Stamatopoulos* v. *ECS North America, LLC*, 172 Conn. App. 92, 96 n.3, 159 A.3d 233 (2017).

[3] According to the court, the plaintiff "seemed eager to express himself as strongly as possible throughout this project," which included "some particularly aggressive, bellicose and unpleasant e-mails authored by the plaintiff." The court set forth the following facts underlying the conflict between the plaintiff and PH: "Serious conflicts in connection with the home renovation project arose with change order requests submitted by VAS in May, 2011. . . . VAS submitted suggested change orders which included proposed pricing for the addition of radiant heating in the house. . . . A revised request by VAS included a 'log starter' for indoor and outdoor fireplaces . . . and one concerning the stone wall. The largest item was the addition of radiant heating, about $28,000. PH e-mailed all this information to [the plaintiff] with the comment that PH had reviewed it and was prepared to discuss the issues with [the plaintiff] at an upcoming meeting. . . . After receiving a negative response from [the plaintiff], Paulos replied that PH did not approve or recommend the change order request from VAS and suggested a 'private discussion' with [the plaintiff]. . . . At that point, on May 26, 2011, at 11:39 p.m., [the] plaintiff sent a message to Paulos, demeaning Paulos' father-in-law, calling him a 'scumbag fraud,' attacking VAS' pricing, and stating, '[t]he price is going to be what I want or we settle in court and lawsuits will be in millions. Game over. Fight back? Ask Maria [Claudio, the plaintiff's assistant] what will happen. I do not lose EVER.' . . ."

"Hubbard and Paulos testified they were both shocked when they read [the plaintiff's] vituperative and obscene middle of the night e-mail. . . . Paulos, who read the message the next morning while preparing his children for school, was also nervous about his family. . . . Hubbard and Paulos decided to contact their insurance company and attorney, and Paulos had no further contact with [the plaintiff]; Paulos testified that from that point 'I was not working for [the plaintiff].' . . . Subsequently, a letter was prepared by PH terminating its services for [the plaintiff], but it was not sent, because on June 2, 2011, [the plaintiff] e-mailed Hubbard that Hubbard's services were terminated, and incongruously adding that '[Paulos] was who I hired and prefer to have solely involved.' . . . With Hubbard fired and Paulos avoiding all contact with [the plaintiff], a formal letter of PH's withdrawal was sent to [the plaintiff's] attorney on June 3, [2011]."

[4] VAS later amended its counterclaim to add additional counts seeking to recover damages under alternative theories of unjust enrichment and quantum meruit.

[5] As the court aptly explained in its memorandum of decision, "[a] change order is a means to increase or decrease the contracted price for construction work caused by a change in the scope of work, in materials, the time required, or otherwise."

[6] This claim with respect to PH is closely related to the plaintiff's additional claim, addressed in part III of this opinion, that PH breached its agreement to provide contract administration services, which the plaintiff argues placed a duty on PH to oversee the project and to protect the plaintiff's fiduciary interests.

[7] The court also rejected the plaintiff's claim that the repositioning of the wall resulted in $305,000 in damages, which his expert had estimated to be the cost of removing and replacing the stone wall and fence. The court indicated: "There is no evidence or economic rationale to support incurring the costs of removing and rebuilding the stone wall, *even if the court had not found its location to be the result of [the plaintiff's] decisions.*" (Emphasis added.)

[8] The court did indicate that it believed the plaintiff had utilized "a makeshift method *of proving damages*"; (emphasis added); however, we do not agree with the plaintiff that this was intended to suggest that it generally was impermissible to use estimates to assign value to punch list items.