******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DEREK J. DELEO *v.* EQUALE &
CIRONE, LLP, ET AL.
(AC 42383)

Alvord, Bright and Norcott, Js.*

*Syllabus*

The plaintiff, a certified public accountant, was a partner at the defendant
accounting firm, where the defendant C was a managing partner. After
the plaintiff left the partnership, he brought an action against the defen-
dants, claiming, inter alia, a breach of fiduciary duty. The defendants
filed a counterclaim, alleging, inter alia, damages under a noncompete
provision in the partnership agreement. Following the trial court's judg-
ment in favor of the defendants on the complaint and on the counter-
claim, the plaintiff appealed to this court, which reversed the judgment
of damages pursuant to the noncompete provision and directed the trial
court to determine whether the noncompete provision constituted a
reasonable restraint of trade. The trial court thereafter concluded that
the noncompete provision constituted an unreasonable restraint of trade
and was therefore unenforceable and rendered judgment for the plaintiff,
and the defendants appealed to this court. *Held* that the trial court
properly determined that, under the specific facts found, which were
not clearly erroneous, the noncompete provision unreasonably
restrained trade and was unenforceable: although the parties had equal
bargaining power and entered into the partnership agreement voluntca-
rily, that was not determinative of whether the noncompete provision
was a reasonable restraint of trade, the court's conclusion was legally
correct based on the factual circumstances in this case, weighed in
totality and balancing the factors the Supreme Court determined in *Scott*
v. *General Iron & Welding Co.* (171 Conn. 132), as the noncompete
provision was not reasonably necessary to protect the defendants' busi-
ness interests, as the court found that the noncompete provision imposed
a significant financial hardship on the plaintiff that was so disproportion-
ate to what was necessary to protect the defendants' business interests
that it instead constituted a windfall to the defendants and would prevent
the plaintiff from practicing his profession, the plaintiff did not obtain
specialized knowledge or trade secrets from his work with the partner-
ship that would have given him a competitive advantage with clients,
and the noncompete provision imposed the same financial burden on
the plaintiff regardless of how or when the client was developed and
how much work was performed for the client; moreover, complete
enforcement of the provision would have effectively restrained the pub-
lic's rights to the plaintiff's services, barring clients' ability to hire the
plaintiff and leaving them without the ability to engage the accountant
of their choice; furthermore, the duration of the noncompete provision
was unreasonable, as five years was longer than necessary to protect
the defendants' interests and was longer than the period the plaintiff had
been subjected to the partnership agreement, and any of the plaintiff's
business with a former partnership client would trigger the penalty,
regardless of the circumstances.

Argued March 10, 2020—officially released February 23, 2021

*Procedural History*

Action to recover damages for, inter alia, alleged
breach of fiduciary duty, and for other relief, brought
to the Superior Court in the judicial district of Danbury,
where the defendants filed a counterclaim; thereafter,
the matter was tried to the court, *Truglia, J.*; judgment
for the defendants on the complaint and in part on the
counterclaim, from which the plaintiff appealed to this
court, *Lavine, Prescott* and *Bright, Js.*, which reversed
in part the trial court's judgment and remanded the

case for further proceedings; subsequently, the court, *Krumeich, J.*, rendered judgment for the plaintiff on the counterclaim, and the defendants appealed to this court. *Affirmed.*

*Daniel J. Krisch*, with whom, on the brief, was *Kevin J. Green*, for the appellants (defendants).

*Michael S. Taylor*, with whom was *Brendon P. Levesque*, for the appellee (plaintiff).

*Opinion*

BRIGHT, J. The defendants, Equale & Cirone, LLP (partnership), and Anthony W. Cirone, Jr., appeal from the judgment of the trial court rendered in favor of the plaintiff, Derek J. DeLeo, on the defendants' counterclaim for damages under the noncompete provision of the parties' partnership agreement (noncompete provision). The defendants claim that the trial court erred in concluding that the noncompete provision constitutes an unreasonable restraint of trade and, therefore, is unenforceable. We affirm the judgment of the trial court.

This case returns to us after our decision in *DeLeo* v. *Equale & Cirone, LLP*, 180 Conn. App. 744, 184 A.3d 1264 (2018) (*DeLeo I*). In *DeLeo I*, this court reversed the judgment of the trial court, which had awarded damages in the amount of $740,783 to the defendants on the basis of the defendants' counterclaim under the parties' noncompete provision, and remanded the case with direction that the trial court determine whether the noncompete provision constitutes a reasonable restraint of trade under existing law. Id., 751, 765. Following our remand, the court, in its memorandum of decision dated November 28, 2018, determined that the noncompete provision is unreasonable and, therefore, unenforceable. This appeal challenges the court's determination.

Our opinion in *DeLeo I* sets forth the following relevant facts and procedural history. "The partnership, an accounting firm, is a limited liability partnership located in Bethel. Joseph A. Equale, Jr., and Cirone formed the partnership in 1999. In 2005, the plaintiff, a certified public accountant, joined the partnership as an equity partner. The partnership operated under an oral partnership agreement until January, 2009, when Equale, Cirone, and the plaintiff executed a written partnership agreement (partnership agreement). Pursuant to the partnership agreement, Cirone held a 40 percent interest, Equale held a 35 percent interest, and the plaintiff held a 25 percent interest. The partnership agreement was intended to govern all aspects of the partnership.

"In January, 2012, the partnership purchased the assets of Allen & Tyransky, an accounting firm located in Danbury. As a result of the acquisition, Jack Tyransky became a nonequity 'contract' partner of the partnership. Shortly after the acquisition of Allen & Tyransky, several of the partnership's employees began to suspect that the plaintiff was involved in a romantic relationship with a female staff accountant at the partnership. In October, 2012, Cirone learned about the suspicions regarding the plaintiff's relationship with the staff accountant. Thereafter, Cirone confronted the plaintiff about the alleged relationship, but the plaintiff denied any such relationship. Later, Cirone approached Equale,

who was preparing to retire from the partnership at the end of 2012, to discuss the plaintiff's alleged relationship. Both Equale and Cirone decided to believe the plaintiff's denial, and they did not take any further action at that time.

"Equale retired, effective January 1, 2013, but he continued to work for the partnership through the end of the 2013 tax season. Pursuant to the partnership agreement, Equale's shares were acquired by the partnership upon his retirement. Cirone and the plaintiff agreed that following Equale's retirement Cirone would own 62 percent of the partnership and the plaintiff would own the remaining 38 percent.

"On April 26, 2013, after the completion of the 2013 tax season, Cirone, Tyransky, and the plaintiff met at a diner to discuss the future of the partnership in light of the plaintiff's suspected relationship with the staff accountant. At this meeting,[1] Cirone told the plaintiff that they needed to fire the staff accountant and terminate their partnership. The court credited Cirone's testimony regarding this meeting, finding that 'given [Cirone's] position as managing partner of the firm and also given the risks that [the plaintiff's] actions posed to the firm, [Cirone] had no choice but to separate [the plaintiff] from the partnership.' The plaintiff and Cirone agreed that their business relationship had to end, and they acknowledged that any plan for the plaintiff's departure would begin with the partnership agreement.

"Following their meeting, Cirone and the plaintiff exchanged several e-mails during May and June, 2013, regarding the plaintiff's departure from the partnership. In these e-mails, the plaintiff did not deny that he was leaving the partnership, and there was no indication that he believed that the partnership was being dissolved. Following these exchanges, Cirone sent an e-mail to the partnership's employees informing them that the plaintiff would be 'transitioning out of the firm' beginning on June 17, 2013. The plaintiff retained his 38 percent partnership interest through June 30, 2013, and, after leaving the partnership, he continued to provide accounting services in New Milford. Following the plaintiff's departure, Cirone first transferred the plaintiff's interest in the partnership to himself, and then he transferred a 1 percent interest to Tyransky.

"In September, 2013, approximately two months after leaving the partnership, the plaintiff commenced the present action against the defendants. The operative amended complaint was filed on September 29, 2014, and contained seven counts alleging, inter alia, that the plaintiff held a 38 percent interest in the partnership, and that Cirone had excluded him from the daily operations of the partnership. He further alleged that Cirone's conduct had frustrated the economic purpose of the partnership such that it was no longer reasonably practicable to continue the partnership's business in accor-

dance with the partnership agreement. Additionally, the plaintiff alleged claims of breach of fiduciary duty and conversion. The plaintiff sought, inter alia, a dissolution and winding up of the partnership pursuant to General Statutes §§ 34-339 (b) (2) (C) and 34-372 (5); restoration of his partnership rights pursuant to § 34-339 (b) (1); an accounting and access to the partnership's books and records pursuant to General Statutes §§ 34-337 and 34-338; appointment of a receiver pursuant to General Statutes § 52-509; and money damages.

"On January 6, 2015, the defendants filed an answer denying the plaintiff's allegations or leaving him to his proof, asserted various special defenses and a claim for setoff. . . .

"The defendants also filed a four count counterclaim against the plaintiff, claiming that the partnership had terminated the plaintiff's partnership interest for cause, or, in the alternative, that the plaintiff had terminated his partnership interest voluntarily. In both counts the defendants claimed that the value of the plaintiff's partnership interest was limited to the accrual basis capital value,[2] as defined in the partnership agreement. Additionally, the defendants claimed that the plaintiff is subject to the noncompete provision in the partnership agreement, requiring him to compensate the partnership for any former clients of the partnership for whom the plaintiff had provided accounting services following his departure.[3] In counts three and four, the defendants alleged that the plaintiff breached his fiduciary duty pursuant to the partnership agreement and/or pursuant to §§ 34-338 and 34-339.

"The plaintiff denied all the allegations as set forth in the defendants' special defenses and claim for setoff. He also denied the allegations in the defendants' counterclaim and, by way of special defense, asserted that the defendants had waived the enforcement of the noncompete provision.

"The case was tried to the court over the course of six days in September, 2015. In its memorandum of decision dated October 22, 2015, the court rendered judgment in favor of the defendants on the plaintiff's complaint and the defendants' special defenses. The court did not credit the plaintiff's testimony, finding that the plaintiff, 'through his words and actions, starting with the April 26 meeting through July of 2013, voluntarily withdrew as a partner of [the partnership].' The court credited Cirone's testimony, finding that Cirone did not waive the partnership's right to enforce the noncompete provision in the partnership agreement, and that the plaintiff had agreed to terminate his partnership interest as of June 30, 2013. The court further found that the voluntary termination provision[4] in the partnership agreement determined the amount due to the plaintiff. Accordingly, the court rendered judgment in favor of the defendants on their counterclaim and

on the plaintiff's special defense. The court awarded the defendants $740,783. The court credited the testimony of the defendants' expert witness with respect to the calculation of the plaintiff's accrual basis capital as of June 30, 2013, and the amount owed by the plaintiff to the partnership, pursuant to the noncompete provision in the partnership agreement. The court found that the plaintiff was overdrawn in his partnership income account by $143,496 as of June 30, 2013, and that his accrual basis capital as of June 30, 2013, was $165,079. The court also found that the plaintiff owed $762,366 to the partnership pursuant to the noncompete provision." (Footnotes in original; footnote added.) Id., 747–52.

The plaintiff appealed from the judgment of the trial court rendered in favor of the defendants on the plaintiff's complaint and the defendants' special defenses, claim of setoff, and counterclaim, claiming that the court "(1) committed plain error when it failed to order the dissolution of the partnership; (2) improperly estopped [the plaintiff] from challenging the noncompete provision in the partnership agreement; (3) improperly found that the defendants did not waive the enforcement of the noncompete provision; and (4) improperly concluded that the noncompete clause in the partnership agreement was enforceable." Id., 747. This court affirmed in part and reversed in part the judgment of the trial court; we rejected all of the plaintiff's claims except his fourth claim—which concerned count two of the defendants' counterclaim—regarding the enforceability of the noncompete provision in the partnership agreement. Id. Specifically, this court determined that the court improperly treated the noncompete provision as a liquidated damages clause and, instead, should have considered the reasonableness of the noncompete provision under the same standard used for covenants not to compete. Id., 761–65. Accordingly, we remanded the case to the trial court with direction to consider the reasonableness of the noncompete provision. Id., 765.

Following our remand, the trial court, in its memorandum of decision dated November 28, 2018, determined that the restrictions imposed by the noncompete provision in the parties' partnership agreement constitute an unreasonable restraint of trade and, therefore, are unenforceable. In reaching its conclusion, the trial court made the following subordinate factual findings: (1) the requirements of the noncompete provision, and particularly the five year restriction, exceed what would be necessary to protect the defendants' business interests; (2) the noncompete provision interferes with the plaintiff's ability to pursue his occupation as a certified public accountant; and (3) enforcement of the noncompete provision would affect adversely the public's ability to retain the accounting services of its choice. This appeal followed. Additional facts will be set forth as necessary.

The defendants claim that the trial court erred by concluding that the noncompete provision is unenforceable. Specifically, the defendants argue that (1) the parties, as partners, had equal bargaining power and the plaintiff entered into the partnership agreement voluntarily, (2) the partnership has a legitimate interest in restricting the plaintiff from servicing former and existing clients, (3) the noncompete provision has a reasonable duration, and (4) the noncompete provision does not harm the public interest. For these reasons, the defendants argue that the noncompete provision is a reasonable restraint of trade and is enforceable. We are not persuaded.

I

As a preliminary matter, we address first the applicable standard of review. The defendants maintain that the court's findings as to the reasonableness and enforceability of the noncompete provision must be evaluated under the plenary standard of review. Specifically, the defendants state at the outset of their principal appellate brief that this appeal challenges "the propriety of the trial court's 'application of the legal standards to [its] historical fact determinations, [which] are not facts in this sense.' "[5] Conversely, the plaintiff argues that this court should apply the clearly erroneous standard of review because a determination as to the reasonableness of a covenant not to compete is a fact driven inquiry.

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts as they appear in the record. . . .

"[W]hen the resolution of a question of law . . . depends on underlying facts that are in dispute, that question becomes, in essence, a mixed question of fact and law. Thus, we review the subsidiary findings of historical fact, which constitute a recital of external events and the credibility of their narrators, for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Citation omitted; internal quotation marks omitted.) *Saggese* v. *Beazley Co. Realtors*, 155 Conn. App. 734, 751–52, 109 A.3d 1043 (2015).

We agree with the defendants that the court's ultimate conclusion as to the enforceability of the noncompete provision presents a question of law that requires our plenary review. However, the court reached that conclusion only after it heard the parties' evidence on the effects that enforcement of the noncompete provision

would have on them and third parties. The court's factual findings on the basis of that evidence are what led it to conclude that the noncompete provision constitutes an unreasonable restraint of trade. To that end, our plenary review is constrained by the court's factual findings, and we are bound to accept those findings "absent a showing that they are clearly erroneous in light of the evidence." *Prestige Management, LLC* v. *Auger*, 92 Conn. App. 521, 525, 886 A.2d 458 (2005). As this court recently stated in *National Waste Associates, LLC* v. *Scharf*, 183 Conn. App. 734, 745, 194 A.3d 1 (2018), "[a]nalysis of the validity and enforceability of such covenants entails a *fact-specific inquiry*." (Emphasis added.) This is not to say that a question as to the enforceability of a noncompete provision presents *only* an issue of fact but, rather, that the ultimate legal conclusion as to a covenant's enforceability is predicated on specific facts that, if challenged, must be reviewed for clear error. [6] Consequently, we first must evaluate the court's subordinate factual findings challenged by the defendants in order to determine whether they were clearly erroneous.

## II

The court made factual findings in its November 28, 2018 memorandum of decision that can be grouped in the following manner: (1) the requirements of the noncompete provision, and particularly the five year restriction, exceed what would be necessary to protect the defendants' business interests; (2) the noncompete provision interferes with the plaintiff's ability to pursue his occupation as a certified public accountant; and (3) enforcement of the noncompete provision would adversely affect the public's ability to retain the accounting services of its choice.[7]

"It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . We afford great weight to the trial court's findings because of its function to weigh the evidence and determine credibility. . . . Thus, those findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Abrams* v. *PH Architects, LLC*, 183 Conn. App. 777, 787–88, 193 A.3d 1230, cert. denied, 330 Conn. 925, 194 A.3d 290 (2018).

After a careful review of the record, we conclude that the court's factual findings were not clearly erroneous. We begin with the court's finding that the restraints

of the noncompete provision exceed what would be necessary to protect the defendants' business interests, both in terms of the length of the restriction and of the clients covered. As to the duration of the restriction, the court explained that "[t]he five year term is considerably longer than the one to two year terms usually considered reasonable if needed to protect an established business interest. . . . The length of the restriction exceeds the duration of the period when [the plaintiff] was subject to the agreement. Moreover, the lengthy time period means that any business for a former or present [partnership] client during the five year period would trigger the penalty even if that client had not been [a partnership] client during most of the restricted period, or had left [the partnership] for reasons unrelated to [the plaintiff], or had stayed with [the partnership] but used [the plaintiff] for only part of the work during the period or had only come to [the plaintiff] years after the client left [the partnership] for other reasons without any solicitation by [the plaintiff]." (Citations omitted.)

The court further explained specifically that the partnership agreement and, in particular, the noncompete provision, "does not distinguish between clients brought into the firm by [the plaintiff] and those he serviced while at [the partnership] who were integrated firm clients or clients developed and/or referred to [the plaintiff] by others at the firm." This fact was of particular significance to the court's reasoning because the plaintiff, upon joining the partnership in 2005, brought with him approximately 250 to 300 clients, which represented approximately 25 to 30 percent of the partnership's total client base at the time.

The court also found credible the plaintiff's testimony that 60 percent of his clients at the partnership were clients that he had brought to the partnership from his previous practice, while 40 percent were developed by him at the partnership through networking. Consequently, the court concluded that "[t]his also was not a case where a long-standing relationship made it difficult to disentangle client relationships and to allocate goodwill between the withdrawing partner and the [partnership]. . . . [The partnership] was formed in 1999 when two sole proprietorships merged. In 2005 [the plaintiff] joined the [partnership] as an equity partner when his sole proprietorship merged with [the partnership]. His existing clients became clients of [the partnership] and represented roughly 25 [to] 30 [percent] of [the partnership's] client base at the time he joined the firm. There is no evidence that [the partnership] purchased his practice and paid [the plaintiff] for his client base or that after the merger, his practice became fully integrated into [the partnership] so that his clients ceased to be his primary client relationship and they became [partnership] clients. Nor is there evidence that [the partnership] was the source of [the

plaintiff's] acquaintance with the customers so that his employment was the primary source of client relationships and he was in an unfair position to compete with [the partnership] after termination of his partnership [interest]. Rather it appears even after the merger, [the plaintiff's] former sole proprietorship clients and those he developed by his efforts at [the partnership], and not through referrals from other partners, remained identified with him and the client relationship was primarily with him, not [with the partnership]. When he left nearly 100 percent of his clients at [the partnership] followed him to his new firm. This is compelling evidence the clients did not consider themselves [partnership] clients." (Citation omitted; footnotes omitted.)

The court also addressed whether the plaintiff had access to proprietary information of the partnership when he started his competing business. The court found: "Any customer list would be a list of [the plaintiff's] own clients. There is no evidence of any specialized knowledge or trade secrets [the plaintiff] acquired from [the partnership]. His familiarity with the clients and their needs would not alone suffice as specialized knowledge of [the partnership] to uphold the restrictions as that information could easily have been obtained from the clients themselves when they engaged [the plaintiff's] services." On the basis of this evidence, the court found that the plaintiff's employment with the partnership did not provide him with an unfair advantage in competing for clients after leaving the partnership.

In light of the fact that the plaintiff had not obtained any specialized knowledge or trade secrets through his employment with the defendants, the court found that the benefits the defendants would receive from the noncompete provision "far [exceed] any contributions [the partnership] may have provided to generate goodwill in [the plaintiff's] clients." In reaching that determination, the court noted: "There is no evidence that [the partnership] did anything special to generate goodwill in [the plaintiff's] client base other than to pay the ordinary overhead attributable to providing accounting services (i.e., staff, technology, fixed costs, etc.), and that was funded by fees generated by the services provided to these clients, which according to Cirone generated profits to [the partnership] of 25 [to] 35 percent so 65 [to] 75 percent of revenues covered overhead. The partnership agreement in Section F 3 characterizes the payment required for competing with [the partnership] measured by 150 [percent] of [the plaintiff's] billings 'as compensation for the goodwill and know-how of [the partnership] relating to such client,' yet it appears that [the plaintiff] was the one who primarily provided such 'know-how' . . . and it was [the plaintiff] who maintained and developed the client relationships." On the basis of this evidence, the court reasoned that the disproportionate effect that enforcement of

the noncompete provision would have on the plaintiff exceeds what would be necessary to protect the defendants' business interests.

The court further found that the restriction exceeds what would be necessary to protect the defendants' business interests by such a degree that it would result in a "windfall"[8] to the defendants that is "disproportionate to the goodwill of the former [partnership's] clients who followed [the plaintiff] to his new practice." The court found that if the plaintiff violated the noncompete provision as written, he would be required to pay $762,366 to the defendants, which is based on a fee of 150 percent of his share of goodwill. Because the fee is not dependent on how much the plaintiff earned from a former client or what services he performed for a client during the five year period, the court found that "[i]f [the plaintiff] performed any services for a former [partnership] client during the five year period, it would trigger a fee of 150 [percent] of that client's revenues received by [the partnership] for the most recent two years thereby paying [the partnership] a premium above any firm contribution to goodwill."

The court relied on, and cited to, evidence in the record that supports the finding that the noncompete provision exceeds what is necessary to protect the defendants' interests. This evidence is sufficient to support the court's factual findings. The plaintiff testified that he brought an established base of 250 to 300 clients to the partnership, this was 25 to 30 percent of the partnership's client base, he maintained control over this client pool, he brought new clients into the partnership on his own, and when he left the partnership nearly all of his clients followed him. Additionally, we agree with the court that there is no evidence that the plaintiff received specialized knowledge or trade secrets from the defendants, and there is no evidence that the partnership did anything to generate goodwill in the plaintiff's client base.

The defendants contend that the court's findings are contradictory to the extent that the court recognized that the "obvious aim" of the noncompete provision was to "dissuade [the plaintiff] from servicing existing clients after he left [the partnership] by imposing financial burdens that would make competition unfeasible and expensive," but, nevertheless, concluded that the partnership's clients' "future goodwill clearly was not expected to remain with [the partnership]" because the plaintiff could provide former clients with his accounting services in his new practice. (Internal quotation marks omitted.) Consequently, the defendants maintain that the noncompete provision, in fact, does protect the partnership's legitimate business interest in retaining its clients' goodwill, and the evidence in the record supports such a conclusion.[9] We are not persuaded.

The court did not find that the noncompete provision

did not protect the defendants' business. To the contrary, the court found that the noncompete provision provides greater protection than the defendants legitimately need. It is obvious that the more onerous a noncompete provision is to a former partner, the greater the benefit to the partnership he is leaving. Finding that a noncompete provision benefits the partnership is, therefore, very different than finding that the covenant's restrictions are needed to protect the partnership's business interests. Thus, the defendants' argument does not address the actual finding of the court that the covenant is *more restrictive than necessary* to protect the defendants' business interests. Because there is evidence in the record that supports the court's factual findings as to the necessity of the reach of the noncompete provision, we cannot conclude that its findings were clearly erroneous. See *Gorelick* v. *Montanaro*, 119 Conn. App. 785, 808, 990 A.2d 371 (2010).

We next consider the court's factual finding that the noncompete provision interferes with the plaintiff's ability to pursue his occupation as a certified public accountant. In support of their contention that "the facts belie [the court's] conclusion," the defendants argue: "The . . . court's legal conclusion is wrong, even if its finding that the plaintiff's only option was to work for former [partnership] clients is correct. However, the record does not support the finding, either. The plaintiff did not so testify. He claimed only that he 'wouldn't be able to operate as an accountant, as a professional,' if he had 'to make the compensation payment . . . required by the noncompete provision.' . . . Though '[n]early 100 percent' of the clients that the plaintiff took to his new company were former [partnership] clients . . . his own testimony belies the inference that he had no choice except to service those clients. The plaintiff found 100 [to] 120 new clients in his seven plus years at [the partnership]. . . . The court credited the plaintiff for having generated goodwill through those 'efforts,' but ignored his acumen in terms of his post [partnership] options." (Citations omitted.)

In its November 28, 2018 memorandum of decision, the court discussed at length the "easily quantifiable" effects that the noncompete provision would have on the plaintiff. The court stated: "If these provisions are enforceable, [the plaintiff] would owe $762,366 under the noncompete provision in Section III F 3 of the partnership agreement and would lose $144,826 in [deferred income amount] payment that would have been paid if he had not continued to practice public accounting in Connecticut.[10] Moreover, [the plaintiff] would have been entitled to receive accrual based capital of $21,583 that was netted out to calculate the $740,783 damages awarded. If the $762,366 attributable to the noncompete provision [were] paid out over the thirty-six month period called for in the agreement, [the plaintiff] would

have had to pay $21,177 per month.[11] According to the balance sheet of [the plaintiff's new firm] for year-end December 31, 2017, the company had revenues of $1,278,087 and expenses of $1,239,197, which resulted in a net profit of only $32,803. Even if you add the profits to the $200,000 salary paid to [the plaintiff] for pretax profits of $232,803, his monthly pretax income of $19,400.25 would be insufficient to make the monthly payments to [the partnership], with a shortfall each month of $1777. Not only would [the plaintiff] be working for free but he would have to come up with another $21,324 each year for three years (using 2017 results as a baseline) and pay taxes on his income." (Footnotes in original.)

On the basis of the evidence regarding the financial implications that enforcement of the noncompete provision would have on the plaintiff, the court found credible the plaintiff's testimony that he would be unable to continue his accounting practice if he were required to pay the fees called for under the noncompete provision. The court also rejected the defendants' argument that the plaintiff would have "sufficient cash flow with $41,175.75 in monthly revenue from former [partnership] clients to pay [the partnership] $20,500 per month for thirty-six months, leaving him $20,675 in additional revenue from former [partnership] clients to meet his other obligations," because there was no evidence that the plaintiff's profit margin was consistent with what the defendants' expert witness testified to as the industry average.[12] The court, instead, relied on the plaintiff's testimony that his profit margin was 18 percent, finding that it was not reasonable "to expect [the plaintiff] each month to pay an amount equal to one half of revenues from [the partnership's] former clients under the circumstances here." Ultimately, on the basis of these subordinate findings, the court found that "[the plaintiff's] livelihood and welfare would be jeopardized if he had no access to the client base he developed . . . ."

In making these findings, the court relied on, and cited to, evidence in the record that supports the factual findings that the noncompete provision would jeopardize the plaintiff's livelihood and welfare. Specifically, the court's finding is supported by the evidence regarding the plaintiff's pretax income since leaving the partnership, his firm's profit margin and the resulting monthly shortfall he would face for three years were he to pay the noncompete provision's fee. Further, we cannot disturb the court's credibility determination regarding the plaintiff's testimony that he could not afford to practice if required to pay the competition fee under the agreement. See *Abrams* v. *PH Architects*, supra, 183 Conn. App. 787–88. Consequently, the court's finding that the noncompete provision "would interfere with [the plaintiff's] ability to pursue his profession" was not clearly erroneous.

Finally, the court found that the noncompete provision's restrictions adversely affect the public's interest in freely engaging with the certified public accountant of its choice. The court stated: "[The plaintiff's] relationship of trust and knowledge of the clients' affairs and businesses would be difficult to recreate elsewhere if [the plaintiff] [were] not available to continue to service their needs. . . . The public's interest, including the clients' interests, in having [the plaintiff's] professional services would not be served by denying him access to his existing client base without forfeiture of significant income. As a practical matter, if he wanted to continue to practice public accounting, [the plaintiff] would be required to purchase the right to service his own clients from [the partnership] by paying the competition fee and forfeiting his [deferred income amount] payment where the [partnership] deserves little credit for client recruitment and development and the fee is disproportionate to any [partnership] contribution toward development of those clients." (Footnote omitted.)There is support in the record for this conclusion. The plaintiff testified that he would be forced to stop practicing accounting and file for bankruptcy if he were required to pay the entire amount of the forfeiture. Further, Antonio Capanna, a client of the plaintiff for more than fifteen years, testified that the plaintiff knew his business so well that it would have a significant impact on his business if the plaintiff could not practice anymore, and, due to the size and complexity of his business, it would take a new accountant years to learn the business and gain Capanna's trust. On the basis of the record before us, we cannot conclude that it was clear error for the court to conclude that the clients' interest in freely engaging the certified public accountant of their choice would be impeded by enforcement of the noncompete provision. See *Gorelick* v. *Montanaro*, supra, 119 Conn. App. 808.

### III

Having found no clear error in the court's subordinate findings of fact, we turn next to its legal conclusion that the noncompete provision amounts to an unreasonable restraint of trade and, therefore, is unenforceable. The defendants argue that the noncompete provision is valid and enforceable because (1) the parties, as partners, had equal bargaining power and the plaintiff entered into the partnership agreement voluntarily, (2) the partnership has a legitimate interest in restricting the plaintiff from servicing former and existing clients, (3) the noncompete provision has a reasonable duration, and (4) the noncompete provision does not harm the public interest. In light of the court's factual findings, we disagree with each of the defendants' arguments and, for the reasons that follow, conclude that the court did not err by concluding that the noncompete provision amounts to an unreasonable restraint of trade and,

therefore, is unenforceable.

As stated previously in this opinion, we apply our plenary standard of review to the court's ultimate conclusion that the noncompete provision amounts to an unreasonable restraint of trade and, therefore, is unenforceable. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980) ("where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision").

The following legal principles are relevant to our resolution of the defendants' claim. "In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place . . . and must be reasonable—that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. . . . The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." (Citations omitted; internal quotation marks omitted.) *Scott* v. *General Iron & Welding Co.*, 171 Conn. 132, 137, 368 A.2d 111 (1976).

"A covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. . . . There are five criteria by which the reasonableness of a restrictive covenant must be evaluated: (1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the party in whose favor the covenant is made; (4) the restrictions on the employee's ability to pursue his occupation; and (5) the extent of interference with the public's interests. . . . The five prong test of *Scott* is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." (Citations omitted.) *New Haven Tobacco Co.* v. *Perrelli*, 18 Conn. App. 531, 533–34, 559 A.2d 715, cert. denied, 212 Conn. 809, 564 A.2d 1071 (1989).

A

The defendants first argue that the court should not have invalidated the noncompete provision because the parties had equal bargaining power and entered into the partnership agreement voluntarily. Conversely, the plaintiff argues that, although voluntary agreements between partners with equal bargaining power may be more readily enforced than involuntary agreements between an employer and an employee, that legal princi-

ple is irrelevant to our analysis of whether the noncompete provision is an unreasonable and unenforceable restraint of trade. We agree with the plaintiff.

The defendants place significant weight on the circumstances under which the parties entered into the partnership agreement, arguing that the parties' equal bargaining power and sophisticated knowledge of the industry are compelling reasons to uphold the enforcement of the noncompete provision. We are not persuaded. The trial court correctly concluded that the defendants' argument that the parties entered into the partnership agreement voluntarily "does not resolve the question of whether the restraint [the plaintiff] agreed to [is] reasonable and enforceable under all [of] the circumstances." The defendants maintain, however, that the freedom to contract should not be impaired, particularly in this instance, when "[t]he very nature of professional partnerships weighs heavily in favor of enforcement."

We recognize the strong public policy favoring freedom of contract and the principle that the court should not rescue sophisticated commercial parties from the terms of their bargain. See *Schwartz* v. *Family Dental Group, P.C.*, 106 Conn. App. 765, 772–73, 943 A.2d 1122, cert. denied, 288 Conn. 911, 954 A.2d 184 (2008); *Yellow Page Consultants, Inc.* v. *Omni Home Health Services, Inc.*, 59 Conn. App. 194, 199, 756 A.2d 309 (2000). Nevertheless, our Supreme Court has long recognized that a court's deference to the rights of parties to enter into contracts as they see fit does not extend to contracts that violate public policy. For example, the Supreme Court, in evaluating a covenant not to compete, stated more than 100 years ago: "The public [has] an interest in every person's carrying on his trade freely; so has the individual. All interference with individual liberty of action in trading and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and, indeed, it is the only justification, if the restriction is reasonable—reasonable, that is, in reference to the interests of the parties concerned, and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public." (Internal quotation marks omitted.) *Samuel Stores, Inc.* v. *Abrams*, 94 Conn. 248, 252, 108 A. 541 (1919); see also *Beit* v. *Beit*, 135 Conn. 195, 198–99, 63 A.2d 161 (1948). These principles were delineated further by our Supreme Court in *Scott*, which sets forth the test that guides our analysis of whether the noncompete provision is enforceable irrespective of the parties' equal bargaining power and sophistication.

*Scott* v. *General Iron & Welding Co.*, supra, 171 Conn. 137.

Accordingly, we reject the defendants' contention that the circumstances under which the parties entered into the partnership agreement is determinative of whether the noncompete provision in the agreement is reasonable.[13]

B

Before turning to the defendants' remaining three arguments, we discuss briefly our analytical framework in determining the reasonableness and enforceability of the noncompete provision. In their principal brief before this court, the defendants address separately each of the factors established in *Scott*, analogizing the factual circumstances of the present case to those in purportedly similar cases in furtherance of their claim that the court erred in reaching its findings as to the reasonableness of the noncompete provision. The fatal flaw in the defendants' analysis, however, is that it ignores the fact intensive nature of the reasonableness inquiry.[14] We reiterate that a balancing of the *Scott* factors is what informs the court's legal conclusion as to the noncompete provision's enforceability, and, therefore, the court must weigh these factors in their totality on the basis of the factual circumstances before it. See *Mattis* v. *Lally*, 138 Conn. 51, 56, 82 A.2d 155 (1951) ("[e]quity under some circumstances will hold invalid contracts which are so broad in their application that they prevent a party from carrying on his usual vocation and earning a livelihood, thus working undue hardship"). Thus, we address the defendants' remaining arguments together, in the context of the court's factual findings in the present case, to determine if the court's conclusion was legally and logically correct.

The following legal principles are relevant to our resolution of the defendants' claim. "In order for such interference to be reasonable, it first must be determined that the employer is seeking to protect a legally recognized interest, and then, that the means used to achieve this end do not unreasonably deprive the public of essential goods and services. . . .

"In determining whether a restrictive covenant unreasonably deprives the public of essential goods and services, the reasonableness of the scope and severity of the covenant's effect on the public and the probability of the restriction's creating a monopoly in the area of trade must be examined." (Citation omitted.) *New Haven Tobacco Co.* v. *Perrelli*, supra, 18 Conn. App. 536.

"[W]hen the character of the business and the nature of the employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair

protection of the employer's business or rights . . . . Especially if the employment involves . . . [the employee's] contacts and associations with clients or customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge." (Internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 533, 546 A.2d 216 (1988).

In their remaining three arguments, the defendants contend that (1) the partnership has a legitimate interest in protecting its goodwill in its former clients, and restricting the plaintiff from servicing the partnership's client base reasonably achieves that interest, (2) the noncompete provision has a reasonable duration, and (3) the noncompete provision does not harm the public interest. We are not persuaded.

Although it is true that an employer has a legally recognized right to protect its business interest in retaining former and potential future clients; see id.; the defendants' analysis fails to consider whether the means used to achieve that end are reasonably necessary and whether they unreasonably deprive the plaintiff of his right to make a living and the public's right to access the free market.

The court's factual findings as to the disproportionate effect that enforcement of the noncompete provision would have on both the plaintiff and the public undermine the defendants' contention that the noncompete provision "does nothing more than protect [the partnership's] goodwill against piracy by a mutinous partner." (Internal quotation marks omitted.) To the contrary, the court found that the covenant imposes a significant financial hardship on the plaintiff that is so disproportionate to what is needed to protect the defendants from the plaintiff's so-called "piracy" that the court concluded that enforcement of the noncompete provision would result in a windfall to the defendants. The court further found that enforcement of the covenant essentially would prevent the plaintiff from practicing his profession. As set forth in part II of this opinion, the court's findings were not clearly erroneous. Thus, the court did not err in concluding that the scope of the noncompete provision goes beyond what is reasonably necessary to protect the defendants' interests and that enforcement of the noncompete provision would impose a significant financial hardship on the plaintiff by unreasonably impeding his ability to practice his profession.[15]

In addition, the absence of any specialized knowledge or trade secrets obtained by the plaintiff through his employment with the defendants is compelling evidence that the noncompete provision is not reasonably necessary to protect the defendants' interest in

retaining the goodwill of the former clients brought to the partnership by the plaintiff. See *Robert S. Weiss & Associates, Inc.* v. *Wiederlight,* supra, 208 Conn. 533 ("restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights" (internal quotation marks omitted)). The plaintiff, on his termination from the partnership, did not take with him any sensitive information that would give him an advantage in competing with the partnership and retaining the services of his former clients. The only advantage that the plaintiff had in retaining his former clients was his preexisting relationships with them, which, as the trial court found, did not derive from his employment with the partnership. In an effort to protect the goodwill of those clients, however, the defendants now seek to impose onerous financial consequences on the plaintiff's ability to practice his profession, which, given the factual findings of the court, constitute an unreasonable restraint of trade. Notably, the defendants still have the opportunity to retain the clients at issue without the noncompete provision. Moreover, the defendants still have access to approximately 70 percent of their clients, as the plaintiff's clients comprised only 30 percent of the partnership's entire client base.

Furthermore, the court's factual finding that virtually all of the plaintiff's client base was comprised of clients he personally developed, the majority of whom followed him to the partnership from his sole proprietorship, coupled with the fact that the noncompete provision imposes the same financial burden on the plaintiff on a client by client basis regardless of how or when the client was developed and regardless of how much work the plaintiff is currently performing for the client, supports the conclusion that the covenant is not reasonably necessary to protect the defendants' interests and is, therefore, an unreasonable restraint of trade. See *Domurat* v. *Mazzaccoli,* 138 Conn. 327, 330, 84 A.2d 271 (1951) ("[a covenant not to compete] made in connection with the sale of the [goodwill] of a business . . . is valid only when the restraint imposed is no greater than is necessary for the fair and just protection of the business and *does not impose unnecessary hardship on the covenantor*" (emphasis added)).

As to the noncompete provision's effect on the public, the defendants argue that the public interest is not adversely affected because the plaintiff "is not the only competent [certified public accountant] in the Danbury area—nor is [the partnership] the only other available firm. The plaintiff's clients would have had little difficulty finding an alternative to him." The court's factual findings, in which we find no error, belie the defendants' contention. The court acknowledged that "accounting and auditing services are otherwise available to [the plaintiff's] clients" but, stressing the importance of their right to choose an accountant, specifically found that

complete enforcement would effectively bar their ability to hire the plaintiff: "[T]he clients' interest in freely engaging the accountant of [their] choice and the clients' ability to obtain timely and efficient service will be affected if [the plaintiff] were to refrain from representing former [partnership] clients for fear of economic forfeiture and diversion of revenues. . . . That the [noncompete] provision does not bar outright [the plaintiff] servicing former [partnership] clients does not detract from the severe penalty he would incur if the forfeiture of benefits and payment provision were enforceable and the powerful disincentive to service those clients if the restriction were enforced." The fact that there are other accounting services available to the public is relevant to the reasonableness of the noncompete provision. Certainly, the restriction does not create a monopoly for the defendants. Nevertheless, the plaintiff's former clients would be left without the services of the accountant who they had trusted and worked with for several years prior to the plaintiff's departure from the partnership. There being other accountants available in the Danbury area does not detract from Capanna's testimony that it would take him years to feel confident that a new accountant knew his business and to establish a relationship of trust. The adverse effect on the public is reinforced by the fact that the plaintiff's client base followed him to the partnership at the time of the merger and continued to seek his services after his departure therefrom. Although such a negative impact on competition might be reasonable in another case, we conclude, on the basis of the facts as found by the court in this case, particularly that the restraint is greater than is necessary to protect the defendants' interests, that the noncompete provision constitutes an unreasonable restraint of the public's rights to the plaintiff's services.

Finally, we agree with the trial court that, on the facts of this case, the duration of the noncompete provision is unreasonable. The court found that "[t]he length of the restriction exceeds the duration of the period when [the plaintiff] was subject to the [partnership] agreement. Moreover, the lengthy time period means that any business for a former or present [partnership] client during the five year period would trigger the penalty even if that client had not been [a partnership] client during most of the restricted period, or had left [the partnership] for reasons unrelated to [the plaintiff], or had stayed with [the partnership] but used [the plaintiff] for only part of the work during the period, or had only come to [the plaintiff] years after the client left [the partnership] for other reasons without any solicitation by [the plaintiff]." The defendants point to cases in which five year restrictions were upheld, but we agree with the plaintiff that *Scott* calls for a fact specific inquiry and it cannot be said that there is a default number of years that is uniformly reasonable. See

*Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 530 (holding that time restrictions in restrictive covenant are valid "if they are reasonably limited and fairly protect the interests of both parties"); see also footnote 15 of this opinion.[16] Having found no error in the court's factual findings regarding the effect of the five year restriction, particularly that five years is longer than necessary to protect the defendants' interests, we similarly find no error in the court's subsequent conclusion that five years is an unreasonable duration.

Accordingly, we conclude that the court properly determined that, under the specific facts found, the noncompete provision unreasonably restrains trade and, therefore, is unenforceable.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] "The plaintiff secretly recorded this meeting on his cell phone and the parties agreed to enter a transcript of the recording into evidence." *DeLeo I*, supra, 180 Conn. App. 748 n.1.

[2] "Section II E of the partnership agreement defines accrual basis capital value as 'the cash basis financial statement prepared by the [partnership] on a monthly basis modified for inclusion of accounts receivable as defined in [Item F] and work in process in [Item G] with the appropriate adjustments for liabilities and expense accruals including but not limited to payroll accruals, malpractice accruals, and other operating expenses.' " *DeLeo I*, supra, 180 Conn. App. 750 n.2.

[3] Section III F 3 of the partnership agreement, which contains the noncompete provision, provides: "If during the five (5) year period after any retirement/withdrawal/termination [the plaintiff] provides any accounting, auditing, tax or consulting services for a client that was represented by [the partnership] during the two (2) year period prior to his termination, he will pay to [the partnership] as compensation for the goodwill and know-how of [the partnership] relating to such client an amount equal to [150 percent] of the total average annual fees billed to such client or to any related persons or entities by [the partnership] during the two (2) year period prior to such termination. Such amount shall be payable to the partnership in equal monthly installments over the [thirty-six] month period commencing with the date of termination. At the option of [the partnership], such installments may be recovered by [the partnership] by set-off against any payments that may be due to such [p]artner by [the partnership]. A [p]artner, after termination, may serve as a director of a past or present client of [the partnership] without being obligated to make any payment to [the partnership], provided that the [p]artner does not provide accounting, auditing, tax or consulting services to such client. Any [p]artner who violates the noncompete provisions of this section is not entitled to any [deferred income amount] payments. All remaining [deferred income amount] payments will cease and he will be required to return any payments he has received." (Emphasis omitted.)

[4] "Section III D 1 of the partnership agreement provides in relevant part: 'Any Partner may terminate his interest in the [partnership] at any time provided that the Partner gives the partnership at least one hundred eighty (180) days prior notice in writing of his intention to terminate his interest. . . . The only amounts that will be due to such Partner will be his [accrual basis capital], unless, at the discretion of the remaining Partners, they choose to provide any additional payments. . . . As noted in part F 3 of Section III of this Agreement, the withdrawing partner is subject to the [noncompete provision] of that section.' " *DeLeo I*, supra, 180 Conn. App. 751 n.3.

[5] Notwithstanding their contention that our appellate review should be plenary, the defendants maintain that, even under the clearly erroneous standard of review, this court should reach the same result because "[t]he invalidation of a contract made by sophisticated commercial parties with equal bargaining power because one of them regrets the consequences should leave the [c]ourt 'with the definite and firm conviction that a mistake

has been made.' "

[6] The plaintiff relies on *National Waste Associates*, *LLC*, to argue that the ultimate conclusion of whether a noncompete provision is enforceable is a question of fact to be resolved pursuant to the clearly erroneous standard of review. It is true that this court stated in that case: "The parties submit, and we agree, that the clearly erroneous standard of review governs the finding of the trial court as to the enforceability of a restrictive covenant in an employment agreement." *National Waste Associates*, *LLC* v. *Scharf*, supra, 183 Conn. App. 746. A thorough reading of the opinion though makes clear that the issue the court was reviewing was not whether the noncompete provision was reasonable as a matter of law but, rather, whether the plaintiff had proved a breach of the provision as to specific prospective customers. "Contrary to the plaintiff's contention, the record demonstrates that the court did not apply a blanket rule in its May 9, 2016 decision that the provision was unenforceable as to prospects. Rather, in its decision, the court examined whether the plaintiff proved causation and damages with respect to any improper solicitation of the plaintiff's prospects and concluded that it had not." Id., 748–49. Although the court concluded that "the court's finding that the nonsolicitation provision in the plaintiff's employment agreements with [the former employee defendants] was unenforceable as to prospects was not clearly erroneous"; id., 750; we read the opinion as concluding merely that the trial court's findings that the plaintiff had failed to prove its claims as to certain prospective customers were not clearly erroneous. We also find it significant that the parties in *National Waste Associates*, *LLC*, agreed that the clearly erroneous standard of review governed their dispute, further confirming the fact specific nature of the issues raised on appeal in that case. See id., 746.

[7] The court also determined that the geographic area covered by the noncompete provision—the second criterion for determining the reasonableness of such a provision under *Scott* v. *General Iron & Welding Co.*, 171 Conn. 132, 138, 368 A.2d 111 (1976)—was irrelevant to its reasonableness analysis because "the reasonable geographic limitation implied in the agreement is wherever the former [partnership] client is located. That the work may concern matters in other parts of the state or out of state is irrelevant to the restricted competition for [the partnership's] clients." Because neither party challenges this finding and, moreover, because the geographic area covered by the noncompete provision did not affect the court's analysis as to the reasonableness or enforceability of the noncompete provision, we do not consider it on appeal.

[8] Black's Law Dictionary defines a windfall as: "An unanticipated benefit, [usually] in the form of a profit and not caused by the recipient." Black's Law Dictionary (11th ed. 2019) p. 1917. Because a windfall is an unexpected benefit, irrespective of fairness or reasonableness, we conclude that this finding is also a subordinate factual finding and not a conclusion of law.

[9] Both parties agree that the "goodwill" protected by the noncompete provision concerns the value of the partnership's interest in retaining its former clients' patronage.

[10] "[The plaintiff's] share of goodwill would have amounted to $579,305 upon retirement; when he withdrew he was entitled to 25 [percent] of his [deferred income amount] or $144,826 if he had not practiced public accountancy in Connecticut. The forfeiture of [deferred income amount] is part of the anticompetitive consequences of the noncompete provisions in the partnership agreement."

[11] "Because the net award was $740,000, the parties calculated the actual payout to be $20,500 per month for thirty-six months."

[12] The defendants' expert witness testified that the industry profit margin was somewhere between 50 and 60 percent. Cirone testified that the partnership's profit margin was between 25 and 35 percent.

[13] The defendants, for the first time on appeal, also argue that, notwithstanding the established precedent that the reasonableness factors under *Scott* are disjunctive—i.e., a finding of unreasonableness as to any one factor renders the noncompete provision unenforceable—this court should apply the conjunctive analysis purportedly applied by our Supreme Court in *Styles* v. *Lyon*, 87 Conn. 23, 86 A. 564 (1913), and *Cook* v. *Johnson*, 47 Conn. 175 (1879). The defendants' argument is untenable.

Neither case the defendants rely on applies the approach they ask this court to consider. The courts in both *Styles* and *Cook* stated that a restriction that is indefinite as to its duration does not, on its own, necessarily invalidate a noncompete provision if the restrictions therein are limited as to geographic scope and are reasonable in all other respects. *Styles* v. *Lyon*, supra,

87 Conn. 26–27; *Cook* v. *Johnson*, supra, 47 Conn. 178. Consequently, *Styles* and *Cook* simply hold that an indefinite duration in a noncompete provision is not necessarily unreasonable. We fail to see how such a conclusion is inconsistent with the disjunctive approach set forth in *Scott*. See *New Haven Tobacco Co.* v. *Perrelli*, supra, 18 Conn. App. 534.

[14] Most notably, the defendants rely on the five year covenant not to compete that our Supreme Court upheld in *Mattis* v. *Lally*, 138 Conn. 51, 56, 82 A.2d 155 (1951), for the proposition that a restriction of that duration is not violative of public policy. Additionally, the defendants rely on *Mattis* to assert that, contrary to the court's determination that the partnership did not do "anything special" to generate goodwill in the plaintiff's clients, the "beneficiary of goodwill does not have to be the creator of it." The facts in *Mattis* differ greatly from those in the present case.

In *Mattis*, the defendant owned and operated a barbershop, which he sold to the plaintiff "together with all goodwill" for $1500. (Internal quotation marks omitted.) *Mattis* v. *Lally*, supra, 138 Conn. 53. The bill of sale contained a restrictive covenant, which stated that the seller would not "engage in the barbering business for a period of five years" in Rockville. (Internal quotation marks omitted.) Id. At the time of the sale, both parties were aware of the fact that the defendant was fifty-eight years old, was in poor health, and was unfamiliar with other lines of work. Id. Because of his limited work experience in other fields, the defendant continued to work as a barber in the plaintiff's shop for nine months before he elected to operate a one chair barbershop out of his own home. Id. The defendant's home business was within 300 yards of the shop he had sold to the plaintiff, thereby constituting a breach of the restrictive covenant. Id.

On appeal, the court was faced with the question of whether the restrictive covenant at issue constituted an unenforceable restraint of trade. Id., 54. The court reasoned that "[h]aving paid for goodwill, the plaintiff was entitled to have reasonable limitations placed upon the activities of the defendant to protect his purchase," and the durational and geographical limitations under the covenant, having been "fairly and justly calculated to protect the business" were not unreasonable. Id., 54–55. After considering the factual findings of the trial court, namely, the fact that the defendant was not an invalid and could work as a barber outside of Rockville, and that he and his wife would face only minor financial strain if the covenant were enforced, concluded that the covenant was not unreasonable under the circumstances. Id., 56–57.

The distinguishable factual circumstances in *Mattis* illustrate why the defendants' reliance on them is unpersuasive. Unlike in *Mattis*, the defendants in the present case did not purchase the goodwill of the plaintiff's clients at the time of the merger. The trial court found that the noncompete provision's failure to distinguish between the plaintiff's clients that followed him to the partnership and the integrated partnership clients was compelling evidence of an unreasonable restraint, particularly in light of the fact that the plaintiff generated those clients' goodwill through his own individual efforts and business acumen. Moreover, the trial court found, and the evidence supports its finding, that the plaintiff would face significant financial hardship were he to continue servicing the clients that comprised approximately 100 percent of his client base. Although the defendants are correct that the court in *Mattis* upheld the enforceability of a five year covenant not to compete; see id., 56; it reached that conclusion on the basis of the trial court's factual findings that the covenant's geographic restrictions were narrowly tailored such that the defendant was not precluded from earning a livelihood. Id. In light of the trial court's factual findings, the court correctly weighed the impact that enforcement of the covenant would have on the defendant and the public, and determined that, under the circumstances, it would be reasonable to afford the plaintiff's new business some degree of protection because the plaintiff "had purchased the business for a substantial consideration" in reliance on the protections called for under the restrictive covenant. Id., 55.

The fact specific analysis employed by the court in *Mattis* is the approach we apply in the present case.

[15] The defendants also attempt to analogize the factual circumstances in the present case to those in *Scott* in furtherance of their position that the noncompete provision did not deprive the plaintiff of an opportunity to earn a livelihood through his continued practice of public accounting. The defendants' argument is unpersuasive because, like *Mattis*, the facts in *Scott* are distinguishable from the facts in the present case.

In *Scott*, the plaintiff worked for the defendant as a welder until he

ultimately became the chief engineer of the defendant corporation. *Scott* v. *General Iron & Welding Co.*, supra, 171 Conn. 134. As chief engineer, the plaintiff had access to the company's entire customer list and was tasked with soliciting business for the defendant. Id., 135. After a salary dispute, however, the plaintiff gave up his management position and eventually left the company voluntarily. Id. The agreement between the parties contained a covenant not to compete, which prohibited the plaintiff from "disclosing confidential information not generally known in the industry and acquired by him concerning the defendant's products, processes and services, research, inventions, manufacturing, purchasing, accounting, engineering, marketing, merchandising and selling; and from disclosing the list of the defendant's customers to any person or other entity." Id., 135–36. The covenant also contained durational and geographical restrictions, which provided that the plaintiff "for a period of five years after the termination of his employment," would not "within the [s]tate of Connecticut, directly or indirectly, own, manage, operate, control, act as agent for, participate in or be connected in any manner with the ownership, management, operation, or control of any business similar to the type of business conducted by the [defendant] at the time of the termination of his employment." (Internal quotation marks omitted.) Id., 136. Our Supreme Court was faced with the question of whether the covenant constituted an unreasonable restraint of trade. Id.

The court weighed the competing interests of the plaintiff, the defendant, and the public, and determined, inter alia, that the plaintiff's interests properly were protected under the terms of the agreement. Id., 140. Specifically, the court concluded that the covenant was reasonable because the agreement precluded the plaintiff from participating in the metals business only as a manager, not as an employee. Id. The court stated: "At the time of trial, the plaintiff was employed as a welder and was earning $200 per week. Thus, the plaintiff is not being deprived of the opportunity to earn a livelihood for himself and his family or of employment at his trade." Id.

Unlike in *Scott*, the court found that the noncompete provision in the present case does not afford the plaintiff with the same opportunity to make a living practicing his profession. In the present case, the plaintiff is precluded from servicing former partnership clients, which, effectively, forecloses his access to his entire client base. The defendants' argument that the plaintiff could have worked for another firm or pursued other clients ignores the court's factual findings, fully supported by the plaintiff's testimony, to the contrary. The defendants point to no evidence, nor are we aware of any, that suggests that the plaintiff actually would have been able to make a living by servicing a significantly limited client pool or that he had other actual employment opportunities. Although on cross-examination the plaintiff testified that he technically could still practice accounting, and he could find new clients or could work at another accounting firm, the defendants presented no evidence of the likelihood that the plaintiff could find alternative employment or make a living doing so. Furthermore, the defendants' assertion that the plaintiff could have found new clients ignores the harm that would befall his former clients, virtually all of whom preferred the plaintiff's services to other accountants, as evidenced by the fact that all but three of the plaintiff's clients followed him from the partnership.

[16] In *DeLeo I*, we cited *Holloway* v. *Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510 (1990), explaining that "[t]he facts of this case are also remarkably similar to those in [*Holloway*], which our Supreme Court cited with approval in *Deming* [v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 767, 905 A.2d 623 (2006)]. In *Holloway*, the plaintiff, a former partner of an accounting firm, challenged provisions in the partnership agreement that required him to forfeit certain deferred income payments and pay the partnership '100 [percent] of the prior year's fees for any clients' for whom the departing partner continued to provide accounting services." *DeLeo I*, supra, 180 Conn. App. 763. The Court of Appeals of Maryland, applying a similar inquiry based on "the facts of a particular case and the interest of the employer sought to be protected," agreed with the trial court that the five year restriction was longer than needed to protect the firm's relationship with its clients. *Holloway* v. *Faw, Casson & Co.*, supra, 319 Md. 348–50. In this case, the noncompete provision is even more onerous because, in addition to the five year restriction, it requires the payment of "[*150 percent*] of the total average annual fees billed to such client or to any related persons or entities by [the partnership] during the *two (2) year* period prior to such termination." (Emphasis added.) See footnote 3 of this opinion.